## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
Case No.: _____ - cv- _____

JOSE SUAREZ,
JOSE CANTO,

      Plaintiffs,

  v.

THE BAYFRONT PARK
MANAGEMENT TRUST INC.,
JOE CAROLLO, and
JAVIER  BAÑOS,

      Defendants.

_____/

## COMPLAINT

Plaintiffs Jose Suarez and Jose Canto hereby sue defendants The Bayfront Park Management Trust Inc., (the "Bayfront Trust" or "Trust") Joe Carollo and Javier Baños, and in support thereof allege as follows:

## INTRODUCTION

This action under Florida's Whistleblower Law, and 42 U.S.C. § 1983, which prohibits retaliation against employees who expose public corruption, is brought by the former Executive Director and the former Director of Finance for the Bayfront Trust, against the Trust; Joe Carollo, the Chairman of the Board of Trustees of the Trust; and Javier Baños, who serves both as a Trustee for the Trust and as the accountant for Joe Carollo, Carollo's wife, Carollo's Political Action Committee, and all of the companies owned by Carollo and his wife. Carollo and Banos both threatened, and then set out to undermine and force the departures of Suarez and Canto after Suarez and Canto began questioning the Trust's lack of proper accounting practices and procedures that enabled Carollo to (a) use the Trust's funds to pay for Carollo's own political ventures; (b) use the

Trust's funds to support Carollo's District 3 Political Office (c) use the Trust's funds to pay and overpay Carollo's political allies; and (d) use the Trust's funds to overpay Carollo's District 3 Social Media provider, (e) waste the Trust's funds on a 2007 Vet mobile that was never used and that had a suspicious and seemingly untraceable past; e) seek to use the Trust funds to pay for Carollo's Holiday Party. Together, these wrongful expenditures totaled hundreds of thousands of dollars of misused and wasted Trust funds in less than one year, and Carollo has Chaired the Trust for the past eight years without any legitimate oversight.

## PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Jose Suarez ("Suarez") is the former Executive Director of the Bayfront Trust.

2.     Plaintiff Jose Canto ("Canto") is the former Director of Finance for the Bayfront Trust.

3.     Defendant Bayfront Park Management Trust Inc. (the "Bayfront Trust" or "Trust") is a Florida Not-For-Profit Corporation that is an agent and instrumentality of and based in the City of Miami.

4.     Defendant Joe Carollo ("Carollo") is the Chairman of the Board of Trustees of the Bayfront Trust.

5.     Defendant Javier Baños ("Baños") is a Trustee for the Bayfront Trust who is also a relative of Joe Carollo (married to Carollo's cousin) and also the longtime accountant for Joe Carollo; for Joe Carollo's company, Greater Miami Host Association, Inc.; for Joe Carollo's Political Action Committee, Miami First PAC; for Joe Carollo's wife, Marjorie Carollo; and for Marjorie Carollo's company, MTC Group, Inc.

6.     This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331.

7. This Court has supplemental jurisdiction over Plaintiffs' Florida Whistleblower claims pursuant to 28 U.S.C. § 1367, which arise from the same transactions and facts as Plaintiffs' § 1983 claims.

8. Venue lies in the Southern District of Florida because the cause of action accrued here and the Defendants reside here.

## FACTS

9. Carollo has been the Chairman of the Bayfront Trust upon his election as District 3 Commissioner on December 2, 2017 .

10. Plaintiff Suarez, who previously served as Carollo's District 3 Chief of Staff from 2019 through August 2022, was appointed as the Bayfront Trust's Executive Director in March of 2024.

### Suarez Discovers Carollo and The Trust Endangering Park Visitors By Allowing Unpermitted Electrical Work

11. What Suarez found upon his appointment was even worse than had been reported in the Miami Herald.[1]

12. One of Carollo's close friends and political supporters owns El Toro Loco, and Carollo had arranged for El Toro Loco's Food Truck to be stationed at Bayfront Park.

13. Because the food truck needed electricity, El Toro Loco dug a massive, 200-foot long trench to lay electrical wire underground, aiming to steal electricity from an electric sign at the Bayfront Park.

---

[1] Prior to Suarez's appointment, a "35-foot tall Ficus tree thought to be among the oldest in Maurice A. Ferre Park was chopped down by the city of Miami without any advance notice or a removal permit." Linda Robertson, *A giant tree in Miami waterfront park was chopped down by the city – without city approval*, Oct. 19, 2023, MIAMI HERALD https://tinyurl.com/56vy865y (last accessed Jan. 18, 2025).

14.     Not only would this have been theft, it also endangered the lives of the Bayfront Park visitors as it was being done without any electricity meter or engineer surveys and with no permits to dig the trench, lay electric cables, or perform any of the work.

15.     When Suarez discovered the illegally dug trench and illegally placed electrical wiring, Suarez informed Carollo who told Suarez not to worry about it.

16.     Suarez nevertheless ordered El Toro Loco to remove the illegal trench and illegal electrical wires.

17.     Thereafter, El Toro Loco brought a generator to the food truck's location at the park again without any permit from the City.

18.     When Suarez insisted El Toro Loco must obtain a permit to place an electrical generator in the Bayfront Park, they started the process but, being unable to secure the permit, called Suarez from the City's permit department and demanded that Suarez instruct the City to issue the permit.

19.      Suarez refused to engage in any attempt to interfere in the City's permitting process and instead asked the Trust's attorney to terminate El Toro Loco's license from the Trust.

20.     Carollo then warned Suarez that El Toro Loco was "very powerful political ally" and friend and Suarez should steer clear of any further interference.

21.     Upon information and belief, the trench and the electrical wiring remain buried underground to this day.

**Suarez Discovers An Uncontrolled "Money Room"**

22.     One of the main sources of revenue for the Trust is the fees generated by the Trust's parking lots.

23.     Yet when Suarez arrived, the Trust was still collecting parking fees in cash, not by credit card, resulting in employees not only handling thousands of dollars in cash but tens of thousands of dollars being stored in a room designated as "the money room," allowing employees and others to easily "pinch" or take various sums of hard cash for personal gain.

24.     When Suarez eliminated cash payments for parking, revenue immediately increased as "pinching" or "skimming" of the cash was no longer possible.

**Suarez Discovers the Trust Lacks Basic Accounting Policies and Procedures**

25.     Endangering park visitors through unpermitted work is one thing. Endangering $20 million in Trust funds on a yearly basis is another.  Yet, Suarez discovered the Trust, and Carollo as Chairman of the Board of Trustees, and Baños (Carollo's personal accountant who hired his own relative to do the Trust's accounting) failed to follow basic policies necessary to protect Trust funds. For example:

    a.  The Trust did not have adequate accounting or auditing systems or compliances in place.

    b.  The Trust followed no policies or procedures to ensure that vendors were chosen based upon competitive bidding to provide the best service at the best price.

    c.  The Trust had no requirements that expenses paid by Trust funds were supported by a contract or invoice.

    d.  The Trust had been incorrectly recording various expenses and security deposits as revenues, which would inherently miscalculate the Trust's accounting, misleading the public.

    e.  Lack of cash controls or credit card processing for parking revenue

26.     Suarez hired Canto in April of 2024 to help advise on, and implement, the changes necessary to fix the accounting issues and increase transparency, which led to some unsettling discoveries.

**Lack of Controls and Documentation Supporting Carollo's Large Expenditures**

27.     For example, Suarez and Canto confirmed that the check the Trust issued for $562,500 with a mere reference to "dogs & cats" had no supportive documents such as a written contract or even a detailed invoice supporting the check.[2]

28.     This led Suarez and Canto to review other expenditures for supporting documentation, discovery additional irregularities.

**A.  Public Trust Money Was Paid To Support Carollo's Political Office**

29.     Suarez and Canto learned that in late January 2024, the Bayfront Trust wired approximately $45,000 to Joe Carollo's Little Havana Fridays, despite the Bayfront Trust having no association with Carollo's event nor deriving any benefit from Carollo's event.

30.     In addition to that $45,000, the Trust paid an additional $15,000 for artists to perform at Carollo's District 3 event, which was apparently sent directly to a miscellaneous District 3 account.

31.     The $60,000 was allegedly intended to enable Carollo to pay artists to perform at his Little Havana Fridays event, payment which reportedly resulted in booking commissions being paid to entities associated with or controlled by Joe and, or, Marjorie Carollo.

---

[2] The Miami Herald had already criticized the Bayfront Trust for rushing to "award" this project in "a dysfunctional, nontransparent fashion" that was "handed to a single company with little discussion, no competitive bidding and no acknowledgement that spending a big chunk of public money deserves greater scrutiny."  Miami Herald Editorial Board, *Huge dog and cat sculptures might bring Miami tourism magic, but can we discuss it first?*, MIAMI HERALD, https://www.miamiherald.com/article250044569.html (last accessed December 27, 2024).

### B.  Public Trust Money Was Paid To Support Carollo's Political Allies

32.     Suarez and Canto also learned that the Bayfront Trust was paying AmericaTeve $150,000 to broadcast its New Years Eve party <u>instead</u> of having Univision, Telemundo, or even Fox either (a) broadcast the event free of charge; or (b) even pay the Trust for the rights to broadcast the event (as the broadcasters profit by selling advertising).

33.     A broadcaster providing benefit to the event organizer is standard practice in the industry.

34.     Yet here, the Trust has been paying AmericaTeve to broadcast. Joe and Marjorie Carollo are close personal friends with the owners of AmericaTeve, which actively supports Carollo's political career.

### C.  Public Trust Money Was Paid To Carollo's Social Media Provider

35.     Suarez and Canto learned that the Bayfront Trust was paying without any formal contract $6,000 per month – and $80,000 over 19 months – to Macro Films LLC, a company closely associated with Marjorie Carollo.

36.     Suarez determined that this $6,000 per month was wildly overpaying Macro Films for the social media work cut back this amount to $2,300 per month.

37.     Macro Films also runs the social media accounts for Carollo's District 3 Office, which office is also overpaying Macro Films.

38.     Upon information and belief, Marjorie Carollo is getting kickbacks from the payments made to Macro Films by both the Trust and the D3 Office.[3]

---

[3] In past years, the Trust hired a company called Engage Live to provide the staging and tents for the Annual New Years Party, paying Engage Live $300,000.  Carollo replaced Engage Live  with Black Stage Productions, Inc., paying Black Stage $400,000. Black Stage Productions is owned and ran by Esteban ("Steve") Suarez, or Mayor Francis Suarez's cousin.

### D.  Carollo's Personal Accountant Warns Suarez and Canto

39.     When Canto took steps to address these issues and raise concerns with the Trust's accounting errors including misrepresenting revenue and expenses, Suarez was confronted by one of the Trustees, Javier Baños, Joe Carollo's relative and personal accountant.

40.     Baños ominously warned Suarez that he "would rather Canto not express any issues he has with the accounting at the open board meeting" and he "was honestly very displeased with" the transparency that both Suarez and Canto were seeking to impose.

41.     Baños' warning was not only an effort to prevent the detection of any potential wrongdoing by Carollo, but also to protect the "outside" accountant for the Trust, who was not an independent third-party accountant but instead was Mr. Baños' own brother-in-law.

### E.  Public Trust Money Was Wasted on a Suspicious 2007 Vet Mobile

42.     Undeterred, Suarez and Canto found inadequate documentation for the Trust's purchase of a mobile veterinarian van for $115,000.

43.     The van is a 2007 Ford E450, which sold for $70,000 when it was new almost 20 years ago, and with a current fair market value of approximately $30,000.

44.     The Trust has never used its $115,000 2007 Ford E450 van.

45.     The Trust had paid the $115,000 to an entity named Rex Mobile Vet LLC ("Rex Mobile") which was formed on April 21, 2023, four months after the Trust announced its "emergency" plan to procure the vehicle.

46.     Upon information and belief, Rex Mobile never operated the van as a mobile veterinarian clinic but rather purchased it as part of a plan to reconvey it to the Trust, which it did a mere five months later.

47.     Rex Mobile has since become "inactive" on Sunbiz apparently dissolving and ceasing to exist.

48.     When performing a storage assessment, Suarez discovered that the Trust was storing boxes full of medicines that had been in the van.

49.     When Suarez discovered the inventory list of these medicines, Suarez discovered the Trust was in possession of Schedule IV Controlled Substances and prescription drugs, including (a) sedatives (including Acepromazine, Dexmedesed, and Torbugesic / Butorphanol Tartrate); (b) antineurals (including Gabapentin); and (c) anesthetics (including Sevoflurane).

50.     Suarez immediately alerted the Trust's attorney, who spoke with the City Attorney.

51.     Suarez, the Trust's attorney, and the City Attorney all agreed to inform the Police, who took possession of the drugs and later launched an Internal Affairs ("IA") Investigation.

52.     The IA investigators interviewed Suarez as part of the investigation.

53.     When Suarez informed Carollo that Suarez was going to assist the IA investigation, Carollo berated Suarez, stating "I hoped you learned your lesson in trying to be transparent" and ominously telling Suarez that he needed "to lawyer up."

54.     The IA investigation was closed, or covered up, with suspicious irregularities, including (a) the prescription drugs being destroyed shortly after the investigation began and (b) the drugs Bayfront Park purchased and possessed being rebranded as "lost property."

55.     Upon information and belief, the Florida Department of Law Enforcement ("FDLE") is currently investigating the timing of the City's destruction of the evidence.

### F.  The Trust Was Invoiced For Carollo's Personal Holiday Party

56.     Seafair Mega Yachts is a Mega Yacht that rents dock space from The Trust. In the past, Seafair had hosted the annual holiday parties for Carollo, his District Office, and his personal friends and family—free of charge.[4]

57.     On December 5, 2024, Bayfront Park received an "invoice" for **$20 Thousand** from Seafair for a "Private Charter Fee" for an upcoming yacht party it was hosting for Carollo.

58.     Canto requested any document to support the invoice including <u>any</u> agreement by the Trust or its Board to pay the invoice, which did not exist.

59.     Suarez and Canto then learned that the purported reason for the charge in 2024, as opposed to all the other free parties Seafair provided Carollo in the past, was the rising cost of diesel fuel for the boat, and Carollo had agreed to pay for the fuel for his personal party using the Trust's funds.

60.     Therefore, Suarez and Canto questioned the expenditure itself as it was not proper for the Trust to pay for a personal party for Carollo, his friends, his family, and his District 3 Office.

61.     When Suarez and Canto raised their concerns and refused to pay the invoice, Carollo retaliated at the next Board meeting, publicly berating and defaming both of them as set forth below.

62.     However, Seafair thereafter retracted the invoice.

### The Constructive Discharge

63.     After diligently working to bring transparency and ethics to Bayfront Trust, Suarez and Canto were attacked, defamed, and constructively discharged from the Trust, leading to their departures.

---

[4] Despite Seafair gifting Carollo this for years, Carollo has **never disclosed** this gift as part of his disclosures of public office.

64.     After Suarez raised the issue with Bayfront Trust's purchase and ownership of various Controlled Substances and once Carollo learned that Suarez would cooperate with the IA investigation, Carollo started isolating Suarez and working directly to undermine Suarez's ability to act as Executive Director either as a pretext to firing him or to coerce him into departing.

65.     First, Carollo began transferring, replacing, or attacking employees that worked with Suarez.

66.     One Executive Administrator came into Suarez's office crying after meeting with Carollo and informed Suarez that she was resigning.

67.     Carollo also caused Albert Mora, who Suarez brought in to assist in cleaning up the park, to be reassigned.

68.     Second, Carollo began directing employees under Suarez to not cooperate with Suarez and specifically act without informing Suarez in manners inconsistent with Suarez's job requirements.

69.     For instance, Carollo instructed Santravia Butler to undermine Suarez.

70.     Third, and before Suarez even considered departing, Carollo began seeking to replace him by interviewing and seeking to appoint interim directors.

71.     For instance, Carollo approached Santravia Butler about becoming interim director before Suarez thought of departing.

72.     On December 9, 2024, Carollo viciously defamed Canto.

73.     Despite Canto's efforts to increase transparency by raising issues in the Trust's accounting, including its misreporting revenues, Carollo implied Canto was stealing money from the Trust and not fulfilling his work hours. Of course, Canto was not only meeting his work hours and working tirelessly throughout the workweek, but he was also working most weekends.

74.     Carollo's defamatory attacks on Canto caused Canto to suffer medical ailments relating to the stress and anxiety, including pain that prevented Canto from even walking.

75.     Carollo's defamatory attack on Canto immediately affected others. By way of example Carlos Martell suggested Suarez should immediately fire Canto.

76.     Suarez refused to fire Canto, who was helping increase transparency and decrease corruption and self-dealing.

77.     But because of Carollo's defamatory attacks, Canto departed from the Trust.

78.     Then on December 17, 2024, Carollo successfully ousted Suarez when he was forced to depart.

79.     On December 20, 2024, three days after Suarez was ousted from the trust, Carollo held an emergency meeting wherein he sought to defame Suarez, accusing Suarez as engaging in nefarious activities during his tenure as Executive Director.

80.     Carollo embarked on rants against Suarez, falsely claiming Suarez, (a) unbeknownst to Trust board members, did not report for work during the first month of his employment as Executive Director of the Trust despite being compensated during that time; (b) falsified timesheets; (c) granted unauthorized pay raises to subordinate staff; (d) worked remotely and also used vacation hours without disclosure or permission; (e) was responsible for contract errors that were, in fact, made by the Assistant City Attorney assigned to the Trust; (f) didn't communicate with anyone regarding construction issues that threatened to negatively impact the New Year's Eve concert schedule for December 31, 2024 at Bayfront Park; and (g) colluded with a different Assistant City Attorney to have his employment contract drafted to include more favorable terms than what had been approved by the Trust and to have the same executed by the required signatories.

81.     These allegations are patently false, with many being easily debunked by Carollo's own cellphone.

82.     Carollo's disparaging and defamatory statements against Suarez at the December 20, 2024 meeting were also directed at Canto. For example, Carollo implied that Suarez and Canto conspired, and somehow managed, to evade the Trust's hiring process. Carollo complained that no records existed of Canto going through a formal hiring process, in complete disregard of the fact that Canto, at the direction of Suarez, entered all required information into the Trust's HR management system (TriNet), as was the standard protocol for new hires.

83.     Further, Carollo claimed Canto failed to work the requisite number of hours required of his employment position. In furtherance of that lie, Carollo citied, *inter alia*, a biometric time-monitoring system the Trust had recently acquired. Carollo ignored the fact that Canto is the one who identified the need for such a system and was randomly testing it out during the timeframe Carollo highlighted. Moreover, said system was being implemented for use by hourly employees, not salaried executive-level staff such as Canto (or Suarez for that matter).

84.     Carollo's paranoia regarding Canto remained on display when the discussion turned to Suarez's employment contract, when Carollo made a point of emphasizing that Canto was the one who signed as the witness to Suarez's employment agreement. Carollo solicited "testimony" from Maria Gomez, a trust employee, who testified that Suarez allegedly told her Canto had his back and he (Suarez) had his (Canto's), as to imply that Carollo had uncovered some grand conspiracy being carried out by Suarez and Canto regarding Suarez's employment contract.

## Count 1
## Suarez's § 1983 First Amendment Retaliation Claim

85.     Plaintiff Suarez realleges paragraphs 1 through 84 as though fully set forth herein.

86.     The United States Constitution's First Amendment guarantees the right to free speech, which applies to local and state government through decisions of the United States Supreme Court, as well as through the Fourteenth Amendment.

87.     At all times relevant hereto, Mr. Suarez was an employee of the Bayfront Park.

88.     The Bayfront Park is a Trust created by the City of Miami. City of Miami, Charter and Code, Chapter 38 Article III § 38-101 ("There is hereby created and established a limited agency and instrumentality of the city to be known as the 'Bayfront Park Management Trust.'")

89.     During his term as the Executive Director of Bayfront Park, Mr. Suarez participated in investigations by local government agencies; and made certain disclosures to local government agencies and officials including to Miami Police Department, the Chairman, the Board of Trustees, and the Assistant City Attorney assigned to the Trust.

90.     The disclosures described above involved violations or suspected violations of federal, state, or local laws or rules; improper use of governmental office, gross waste of funds, and abuse or gross neglect of duties.

91.     The statements and disclosures made by Mr. Suarez to the local agencies, Chairman, the Board of Trustees, the City Attorney, and the Assistant City Attorney assigned to the Trust, as well as to the public, involve matters of public concern.

92.     At all times material hereto, Defendants have been aware of Mr. Suarez's participation in the local investigations and certain disclosures he made.

93.     The statements and disclosures did not disrupt the function of the Bayfront Trust, but rather were in furtherance of the Trust's interests as the Executive Director, "as the chief executive officer of the trust[.]" City Charter and Code, Chapter 38, Article III § 38-105.

94.     In violation of Mr. Suarez's First Amendment right to free speech, the Bayfront Trust, acting through its Chairman and Board Member Banos, constructively terminated Mr. Suarez; and has since denied Mr. Suarez's compensation, including about three months of salary; and for unused vacation days.

**Count 2**
**Suarez's Claim for Violation of Florida's Whistleblower's Act**
**(§112.3187)**

95.     Plaintiff Suarez realleges paragraphs 1 through 84 above as though fully set forth herein.

96.     At all times relevant hereto, Mr. Suarez was employed by the Bayfront Trust as the Executive Director.

97.     The Bayfront Trust is a trust created by the City of Miami. City of Miami, Charter and Code, Chapter 38 Article III § 38-101 ("There is hereby created and established a limited agency and instrumentality of the city to be known as the 'Bayfront Park Management Trust.'")

98.     The trust is therefore considered a local government authority under Fla. Stat. § 112.3187(8)(b).

99.     During his term as the Executive Director of Bayfront Park, Mr. Suarez participated in investigations by local government agencies; and made certain disclosures to local government agencies and officials, including to Miami Police Department, the Chairman, the Board of Trustees, and the Assistant City Attorney assigned to the Trust.

100.    The above referenced local government departments and personnel have the power to investigate, police, manage, or otherwise remedy the violations described in Mr. Suarez's disclosures.

101.    The disclosures described above involved violations or suspected violations of federal, state, or local laws or rules; improper use of governmental office, gross waste of funds, and abuse or gross neglect of duties.

102.    At all times material hereto, Defendants have been aware of Mr. Suarez's participation in the above-referenced investigations, as well as certain disclosure to investigate agencies.

103.    In retaliation for Mr. Suarez's disclosures and participation in the investigations by local authorities, Mr. Suarez was damaged as he was constructively terminated by the Trust; and has since been denied compensation, including about three months of salary; and for unused vacation days.

104.    Mr. Suarez's constructive termination and denial of compensation was and is in violation of Florida's Whistle Blower's Act of 1986, Section 112.3187 of the Florida Statutes.

105.    Mr. Suarez did not file a written grievance with the executive secretary of the City of Miami stating the nature of his grievance or requesting a hearing with the city of Miami's civil service board.

106.    Filing such a grievance or requesting such a hearing would have been futile for a number of reasons, including:

    a.  The civil service board presents its findings and recommendations to the City of Miami's City Manager, Arthur Noriega.

    b.  Arthur Noriega is biased against Mr. Suarez because the City Manager and his office are complicit in Carollo's misappropriation of Trust assets when it accepted funds paid by the Trust to Carollo's District 3 event.

c. Similarly, Arthur Noriega is a close confidant of Joe Carollo and has worked with Joe Carollo to both pursue with and cover up numerous acts by Carollo that violated the City Charter and constitution. *See generally e.g.*, *Acevedo v. City of Miami*, Case No.: 1:22-cv-20224-KMW (SDFL); *Fuller v. City of Miami*, Case No.: 1:23-24251-FAM (SDFL); *The Mad Room d/b/a/ Ball And Chain v. City of Miami*, Case No.: 1:21-cv-23485-RKA (SDFL).

d. Ultimately, under the City of Miami's Charter, the City Manager recommends course of action to the City Commissioners.

e. City Commissioner Carollo is biased against Mr. Suarez because Mr. Suarez disclosed the his misconduct; and Commissioner Carollo is the moving force behind the retaliation against Mr. Suarez. Mr. Carollo has demonstrated this bias on numerous occasions, including *sua sponte* making baseless defamatory attacks against Mr. Suarez; instructing personnel to directly undermine Suarez's ability to perform as executive director; preemptively interviewing personnel to replace Mr. Suarez; and reassigning or coercing various employees to resign that worked and supported Mr. Suarez.

107. Pursuant to Fla. Stat. § 112.3187(9)(d), Mr. Suarez is entitled to recover all reasonable attorneys' fees and costs incurred in this action.

## Count 3
### Canto's § 1983 First Amendment Retaliation Claim

108. Plaintiff Canto realleges paragraphs 1 through 84 as though fully set forth herein.

109. The United States Constitution's First Amendment guarantees the right to free speech, which applies to local and state government through decisions of the United States Supreme Court, as well as through the Fourteenth Amendment.

110.     At all times relevant hereto, Mr. Canto was an employee of the Bayfront Trust.

111.     The Bayfront Park is a trust created by the City of Miami. City of Miami, Charter and Code, Chapter 38 Article III § 38-101 ("There is hereby created and established a limited agency and instrumentality of the city to be known as the 'Bayfront Park Management Trust.'")

112.     During his term as the Director of Finance at Bayfront Park, Mr. Canto made certain disclosures to local government agencies and officials, including to the Chairman, the Board of Trustees, and the Assistant City Attorney assigned to the Trust.

113.     The disclosures described above involved violations or suspected violations of federal, state, or local laws or rules; improper use of governmental office, gross waste of funds, and abuse or gross neglect of duties.

114.     The statements and disclosures made by Mr. Canto to the Chairman, and the Board of Trustees, as well as to the public, involve matters of public concern.

115.     At all times material hereto, Defendants have been aware of Mr. Canto's disclosures.

116.     The statements and disclosures did not disrupt the function of the Bayfront Trust, but rather were in furtherance of the Trust's interests as the Director of Finance.

117.     In violation of Mr. Canto's First Amendment right to free speech, the Bayfront Trust, acting through its Chairman and Board Member Banos, constructively terminated Mr. Canto.

<u>**Count 4**</u>
<u>**Canto's Claim for Violation of Florida's Whistleblower's Act**</u>
**(§112.3187)**

118.     Plaintiff Canto realleges paragraphs 1 through 84 above as though fully set forth herein.

119.    At all times relevant hereto, Mr. Canto was employed by the Bayfront Park as the Director of Finance.

120.    The Bayfront Trust is a trust created by the City of Miami. City of Miami, Charter and Code, Chapter 38 Article III § 38-101 ("There is hereby created and established a limited agency and instrumentality of the city to be known as the 'Bayfront Park Management Trust.'")

121.    The trust is therefore considered a local government authority under Fla. Stat. § 112.3187(8)(b).

122.    During his term as the Director of Finance at Bayfront Park, Mr. Canto made certain disclosures to local government agencies and officials, including to the Chairman, the Board of Trustees, and the Assistant City Attorney assigned to the Trust.

123.    The above referenced local government departments and personnel have the power to investigate, police, manage, or otherwise remedy the violations described in Mr. Canto's disclosures.

124.    The disclosures described above involved violations or suspected violations of federal, state, or local laws or rules; improper use of governmental office, gross waste of funds, and abuse or gross neglect of duties.

125.    At all times material hereto, Defendants have been aware of Mr. Canto's participation in the above-referenced disclosures.

126.    In retaliation for Mr. Canto's disclosures to local authorities, Mr. Canto was damaged as he was constructively terminated by the Trust.

127.    Mr. Canto's constructive termination and denial of compensation was and is in violation of Florida's Whistle Blower's Act of 1986, Section 112.3187 of the Florida Statutes.

128.     Mr. Canto did not file a written grievance with the executive secretary of the City of Miami stating the nature of his grievance or requesting a hearing with the city of Miami's civil service board.

129.     Filing such a grievance or requesting such a hearing would have been futile for a number of reasons, including:

   a.   The civil service board presents its findings and recommendations to the City of Miami's City Manager, Arthur Noriega.

   b.   Arthur Noriega is biased against Mr. Canto because the City Manager and his office are involved in the misappropriation of Trust assets by accepting funds paid by the Trust to Carollo's District 3 event.

   c.   Similarly, Arthur Noriega is a close confidant of Joe Carollo and has worked with Joe Carollo to both pursue with and cover up numerous acts by Carollo that violated the City Charter and constitution. *See generally e.g.*, *Acevedo v. City of Miami*, Case No.: 1:22-cv-20224-KMW (SDFL); *Fuller v. City of Miami*, Case No.: 1:23-24251-FAM (SDFL); *The Mad Room d/b/a/ Ball And Chain v. City of Miami*, Case No.: 1:21-cv-23485-RKA (SDFL).

   d.   Ultimately, under the City of Miami's Charter, the City Manager recommends course of action to the City Commissioners.

   e.   City Commissioner Carollo is biased against Mr. Canto because Mr. Canto disclosed the Trust's misconduct; and Commissioner Carollo is the moving force behind the retaliation against Mr. Canto. Mr. Carollo has demonstrated this bias on numerous occasions, including *sua sponte* making baseless defamatory attacks against Mr. Canto.

130.     Pursuant to Fla. Stat. § 112.3187(9)(d), Mr. Canto is entitled to recover all reasonable attorneys' fees and costs incurred in this action.

### Count 5
### Canto's Claim for Accounting

131.     Plaintiff reallege paragraphs 1 through 84 above as though fully set forth herein.

132.     The Florida Constitution provides, in relevant part:

> A public office is a public trust. The people shall have the right to secure and sustain that trust against abuse. . . .
>
> A public officer shall not lobby for compensations on issues of policy, appropriations, or procurement before . . . any political subdivision of this state, during his or her term of office. . . ..
>
> A public officer . . . shall not abuse his or her public position in order to obtain **a disproportionate benefit for himself or herself**; **his or her spouse**, children, or employer; or for **any business with which he or she contracts** . . ..

Fla. Const. Section 8. Ethics in government.

133.     The City of Miami expressly adopted the provisions of the Miami-Dade County Citizens' Bill of Rights (*see* City of Miami Charter, Citizens Bill of Rights), which provides,

> 2. *Truth in Government*. No County or municipal officer or employee shall knowingly furnish false information on any public matter, nor knowingly omit significant facts when giving requested information to members of the public.
>
> 13. *Adequate Audits.* An annual audit of the County and each municipality shall be made by an **independent** certified public accounting firm in accordance with generally accepted auditing standards. A summary of the results, including any deficiencies found, shall be made public. In making such audit, proprietary functions shall be audited separately . . .
>
> 15. *Financial Disclosure*. The Commission shall by ordinance make provision for the filing under oath or affirmation by all . . . municipal elected officials . . . of personal financial statements, copies of personal Federal income tax returns, or itemized sources of income statements.

Code of Miami-Dade County, Florida, Citizens' Bill of Rights (emphasis added).

134.     To date, no **independent** third-party accounting firm has audited the Trust and its expenditures; allowing Defendants to use the Trust for various personal expenses, including but not limited to paying Carollo's personal friends premium contracts in atypical fashions.

135.     By way of example, these atypical payments to Carollo's personal friends include (a) the Trust's payment to AmericaTeve for their broadcast of the New Years Eve party contradicts industry standards regarding a broadcaster paying the event organizer (the Trust here) for its exclusive right to broadcast an event; (b) the Trust's payment in a no-bid procurement for the Cats and Dog Walkway; (c) payments to Macro Films, a company closely associated with Marjorie Carollo; (d) payments to support Carollo's District 3 event, Little Havana Fridays, which has no relationship or association with the Trust; and (e) procurement of a vet mobile from a company that did not exist at the time the Trust declared the equipment as an "emergency" procurement; and has since been abandoned.

136.     And, as Joe Carollo admitted, the Trust paid for Carollo and his wife's trip to Spain in the Summer of 2023.[5]

137.     Similarly, the Carollo has attempted to use the Trust to pay or provide premium benefits to Carollo's personal friends, including (a) paying $20,000 for a Yacht Party for Carollo, his friends and family, and District 3 Office; and (b) allowing El Toro Loco to dig up the Park and attempt to steal electricity from the Trust.

138.     As a Miami-Dade resident and taxpayer, Canto has standing to challenge the Trust's improper expenditures, which were "expressly authorized and mandated" by the Trust, in violation of state laws and City rules and procedures.

---

[5] Tess Riski, Judge questions Joe Carollo about 'unusual' financial activity following $63M judgment, July 26, 2024, Miami Herald https://tinyurl.com/4j8bj7pd (last accessed Jan. 20, 2024).

139.    In other words, Canto has standing based on the unconstitutionality of certain appropriations by the Trust as violative of constitutional provisions.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in the Plaintiffs' favor against Defendants, jointly and severally, and award back pay, front pay, loss of fringe benefits; pre-judgment interest; compensatory damages for lost wages, benefits, and other remuneration; accounting; attorneys fees and costs of this action; and grant such other relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial of all claims so triable.

Dated and Filed: January 21, 2025

Respectfully submitted,

**AXS LAW GROUP PLLC**
2121 NW 2nd Avenue,
Miami, FL 33127
Tel: (305) 297-1878

By: /s/ *Jeffrey W. Gutchess*
Jeffrey W. Gutchess
Florida Bar No. 702641
Samuel J. Etkin Kramer
Florida Bar No. 1049581
jeff@axslawgroup.com
sam@axslawgroup.com
eservice@axslawgroup.com

And

**RHODES LAW FIRM, LLC**
P.O. Box 660073
Birmingham, Alabama 35266

Jay Rhodes
Florida Bar No. 388483
rhodes@rhodesllc.com
*Pro Hac Vice pending*

*Attorneys for Plaintiffs Jose Suarez and Jose Canto*