UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-20317-CIV-LENARD/ELFENBEIN

JOSE SUAREZ et al,

      Plaintiffs,

v.

JOE CAROLLO et al,

      Defendants.

_____/

**OMNIBUS ORDER**

THIS CAUSE is before the Court on the Motion to Dismiss ("Bayfront Motion") (D.E. 13) filed by Defendant Bayfront Park Management Trust, Inc. ("Bayfront") and the Motion to Dismiss ("Carollo Motion") (D.E. 14) filed jointly by Defendant Joe Carollo ("Carollo") and Defendant Jose Banos ("Banos"). Both Motions were filed on April 1, 2025.[1] The Motions seek the dismissal with prejudice of the Complaint ("Complaint") (D.E. 1) filed by Plaintiff Jose Suarez ("Suarez") and Plaintiff Jose Canto ("Canto") (collectively "Plaintiffs"). On April 29, 2025, Plaintiffs subsequently filed an Omnibus Response ("Response") (D.E. 30) to the Motions. Defendants jointly filed an Omnibus Reply ("Reply") (D.E. 40) to the Response on May 19, 2025. Having reviewed the

---

[1] When referencing the Carollo Motion and Bayfront Motion jointly, the Court will refer to the documents as the "Motions." When referencing Carollo, Banos, and Bayfront jointly, the Court will refer to the "Defendants."

Motions, the Response, the Reply, the docket, and otherwise being fully informed, the Court finds as follows.

## I.     Background

The allegations of the Complaint are as follows. Bayfront is a trust, established by the City of Miami ("City"), that manages Bayfront Park ("Park") in Downtown Miami. Carollo is the chairman of the board of trustees of Bayfront, and Banos is a trustee for Bayfront.[2] D.E. 1 at 2. Suarez was appointed Bayfront's executive director in March 2024. Suarez, upon his appointment, claims he became aware of a number of unethical or illegal activities being committed by Defendants or by others with Defendants' knowledge and tacit consent. *Id.* at 3-10. Because of Bayfront's alleged failure to follow basic policies to protect Bayfront's funds, Suarez hired Canto in April 2024 to devise and implement policy changes necessary to fix accounting issues and increase transparency. *Id*. at 6. Plaintiffs claim this led to the discovery of further illegal or unethical activities. *Id*.

The unethical or illegal activities include: (1) unpermitted digging of a trench to lay down electrical wiring by El Toro Loco, a local company that operates a food truck at the Park; (2) unpermitted use of an electrical generator by El Torro Loco at the Park after Suarez ordered El Torro Loco to stop digging the trench and laying down wire; (3) an attempt by El Torro Loco to bypass the City's permitting process for use of a generator by demanding Suarez direct the City to issue the permit; (4) storing tens of thousands of dollars in cash revenue from the Park in an apparently accessible "money room," allowing

---

[2] The Complaint claims that, in addition to serving as one of Bayfront's trustees, Banos is Carollo's personal accountant and is related to Carollo. D.E. 1 at 8.

Bayfront employees to steal this money without consequence; (5) failure to follow basic accounting policies and procedures including the lack of auditing systems, failure to ensure vendors were chosen based on competitive criteria, failure to track Bayfront expenses by contract or invoice, incorrect record-keeping of expenses and deposits, and lack of cash controls or credit card processing for parking revenue; (6) issuing a check from Bayfront's funds for $562,500 for "dogs & cats" with no supportive documents such as an invoice or written contract; (7) paying $60,000 to support Carollo's campaigns for political office; (8) paying a further $150,000 to have AmericaTeve broadcast Bayfront's New Year's Eve party, instead of having the party broadcast for free or for a profit by Univision, Telemundo, or Fox; (9) paying a further $80,000 to Macro Films to provide social media services to Bayfront without a formal contract;[3] (10) paying a further $115,000 for a 2007 Ford E450 van ("Van") with a fair market value of $30,000 to Rex Mobile Vet LLC, an entity formed in April 21, 2023, and dissolved prior to the filing of the Complaint; (11) storing Schedule IV controlled substances in the Van; and (12) receipt of a $20,000 invoice from Seafair Mega Yachts for a "Private Charter Fee" for use of a yacht for an annual holiday party hosted by Carollo. D.E. 1 at 3-10.

Plaintiffs claim that they opposed these alleged illegal activities in the following means: (1) Suarez claims he ordered El Toro Loco to cease digging a ditch in the Park and laying down wiring; (2) Suarez claims he insisted El Toro Loco obtain a permit for the use of an electrical generator; (3) Suarez claims he rejected an attempt by EL Torro Loco to

---

[3] The Complaint claims El Toro Loco, AmericaTeve, and Macro Films are all owned by associates of Carollo. D.E. 1 at 3-4, 7.

bypass the permitting process and instead asked Bayfront's attorney to terminate El Torro Loco's license to do business at the Park; (4) Suarez claims he eliminated cash payments for parking revenue in order to close the "money room," which he claims increased Bayfront's revenue; (5) Suarez hired Canto to devise and implement policy changes necessary to fix Bayfront's accounting issues and increase transparency; (6) Suarez claimed he reduced the amount Macro Films was being paid each month from $6,000 to $2,300; (7) Suarez claims that after performing a storage assessment of the Van, he discovered Schedule IV controlled substances, which led him to alert Bayfront's attorney; (8) Suarez claims that alongside Bayfront's attorney, he spoke with the City Attorney and Miami Dade Police ("MPD"); (9) Suarez claims that after speaking to MPD, he participating in an Internal Affairs ("IA") investigation relating to the drugs; and (10) Suarez and Canto claim they questioned the $20,000 bill invoiced to Bayfront in relation to the chartering of the yacht. D.E. 1 at 4-10.

Plaintiffs claim Carollo and Banos opposed their efforts or retaliated against them, culminating in their constructive discharge, in the following ways: (1) after Suarez declined to circumvent City permitting procedures on behalf of El Torro Loco, Carollo warned Suarez that El Torro Loco was a "very powerful political ally" and that Suarez should not further interfere; (2) after Canto raised concerns and attempted to address Bayfront's accounting discrepancies, Banos confronted Suarez and stated he "would rather Canto not express any issues he has with the accounting at the open board meeting" and that he "was honestly very displeased with" the transparency Plaintiffs were seeking to impose; (3) after Suarez informed Carollo he was participating in the IA investigation, Carollo stated "I

hoped you learned your lesson in trying to be transparent" and warned Suarez to "lawyer up"; (4) after Plaintiffs raised concerns relating to the $20,000 yacht charter bill invoiced to Bayfront, Carollo berated and defamed both Plaintiffs at the next Bayfront board meeting; (5) after their efforts to bring transparency to Bayfront and cooperate with the IA investigation, Carollo transferred, replaced, or attacked employees who worked with Suarez, and directed employees working under Suarez not to cooperate with him and to undermine him; (6) Carollo approached and interviewed candidates to replace Suarez as director of Bayfront prior to Suarez's departure; (7) Carollo implied Canto had stolen money from Bayfront and had failed to fulfill his work hours, causing Canto stress and anxiety; (8) Carollo's defamatory attacks caused Canto to resign his position; (9) Carollo ousted Suarez and days later held an emergency meeting where he falsely accused Suarez of failing to show up for work, falsifying timesheets, paying subordinates without authorization, worked remotely and used vacation hours without authorization, was responsible for contract errors, failed to communicate with Bayfront trustees regarding construction matters, and colluded with a City attorney to amend his employment contract with more favorable terms; and (10) at the same emergency meeting falsely accused Canto of evading Bayfront's hiring process, again failing to fulfill work hours, and that Canto colluded with Suarez to each watch the other's back. D.E. 1 at 4-13.

Plaintiffs filed their Complaint on January 21, 2025, alleging five Counts: (1) Suarez's 42 U.S.C. § 1983 First Amendment Retaliation Claim; (2) Suarez's Fla. Stat. Ann. § 112.3187 (Florida Whistleblower Act) Claim; (3) Canto's 42 U.S.C. § 1983 First Amendment Retaliation Claim; (4) Canto's Fla. Stat. Ann. § 112.3187 Claim; and (5)

5

Canto's Claim for Accounting Pursuant to the Florida Constitution and Miami-Dade County Citizen's Bill of Rights. D.E. 1 at 13-22.

The Defendants' Motions each raise several grounds for dismissal, and several bases overlap. However, both Motions bases for dismissal can be distilled to the following points: (1) the Complaint fails to state Suarez's and Canto's claims for § 1983 retaliation; (2) that Carollo and Banos are entitled to qualified immunity as to the § 1983 claims; (3) that Plaintiffs fail to assert a claim for municipal liability against Bayfront; (4) the Complaint fails to state Suarez's and Canto's claims for violations of the Florida Whistleblower Act; (3) that Canto lacks standing to sue for an accounting. D.E. 13 at 3-21; D.E. 14 at 3-19. The Motions argue that the Complaint's alleged deficiencies cannot be cured in an amended complaint and thus request the dismissal of the Complaint with prejudice. D.E. 13 at 21; D.E. 14 at 19.

## II.    Applicable Law

Pursuant to Rule 12(b)(6), a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). *"*A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. This standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*,

6

550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.*

"In civil rights and conspiracy actions, courts have recognized that more than mere conclusory notice pleading is required. In civil rights actions, it has been held that a complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory." *Fullman v. Graddick*, 739 F.2d 553, 556–57 (11th Cir. 1984).

42 U.S.C § 1983 provides a cause of action for any person who, under color of law, has been deprived of their constitutional rights. 42 U.S.C § 1983. This includes retaliation by a state actor for the exercise of First Amendment rights. *See Nieves v. Bartlett*, 587 U.S. 391 (2019). "A public employee cannot be discharged in retaliation for speech protected under the First Amendment." *Paschall v. Hous. Auth. of City of Fort Lauderdale*, No. 06-60656-CIV, 2007 WL 9698299, at *4 (S.D. Fla. Oct. 11, 2007) (citing *Vila v. Padron*, 484 F.3d 1334, 1339 (11th Cir. 2007)). For a public employee to prevail on a retaliation claim, they must show: "(1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action." *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005).

Public employers have an interest in restricting the speech of their employees, however, this does not completely curtail public employees' interest in exercising their First Amendment rights. *See Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968). Instead, Courts balance the interests of the public

7

employee in commenting on matters of public concern and the interests of the public employer in the efficiency of the public services it performs. *Id*. When a public employee's expressions are made pursuant to their official duties, their expressions are not protected by the First Amendment. *Garcetti v. Ceballos*, 547 U.S. 410, 411 (2006). However, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." *Id*. Further, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks*, 573 U.S. 228, 240 (2014).

Florida Statute § 112.3187, or the Florida Whistle-Blower Act, serves to prevent the State of Florida or its agencies from retaliating against: (1) "an employee who reports to an appropriate agency violations of law on the part of a public employer or independent contractor that create a substantial and specific danger to the public's health, safety, or welfare[;]" or (2) "any person who discloses information to an appropriate agency alleging improper use of governmental office, gross waste of funds, or any other abuse or gross neglect of duty on the part of an agency, public officer, or employee." Fla. Stat. Ann. § 112.3187(2) (West). "Generally, retaliation claims under the Florida Whistle-blower Act are analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964." *Perez v. City of Opa-Locka*, No. 22-20748-CIV, 2023 WL 6121896, at *12 (S.D. Fla. Sept. 19, 2023) (citing *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950–51 (11th Cir. 2000)).

"To prevail, a plaintiff must meet the separate requirements set out in the statute's subsections (4), (5), (6), and (7). Failing to meet the requirements of any one of these subsections defeats a claim." *Smith v. City of Tallahassee*, No. 4:17CV565-RH/CAS, 2018 WL 6714325, at *2 (N.D. Fla. Dec. 13, 2018), *aff'd,* 789 F. App'x 783 (11th Cir. 2019). § 112.3287(4) requires a disclosure by the plaintiff. Fla. Stat. Ann. § 112.3187(4) (West). Subsection (5) requires the disclosure of the kind described in subsection (2). Fla. Stat. Ann. § 112.3187(4) (West). Subsection (6) requires the disclosure be made "to any agency or federal government entity having the authority to investigate, police, manage, or otherwise remedy the violation or act." Fla. Stat. Ann. § 112.3187(6) (West). Subsection (7) governs the methods by which the disclosure must be made in order to receive protection, including, *inter alia*, in a written and signed complaint, by participating in an investigation, hearing, or other inquiry conducted by any agency or federal government agency, or by refusing to participate in any adverse action prohibited by the FWA. Fla. Stat. Ann. § 112.3187(7) (West).

Additionally, prior to bringing suit, the FWA requires plaintiffs to exhaust their administrative remedies. Fla. Stat. Ann. § 112.3187(8) (West). However, plaintiffs are not required to exhaust their administrative remedies where to do so would be futile. *Igwe v. City of Miami*, 300 So. 3d 279, 282 (Fla. Dist. Ct. App. 2019).

"The accounting remedy is grounded in equity." *Zaki Kulaibee Establishment v. McFliker*, 771 F.3d 1301, 1310 (11th Cir. 2014). Florida courts grant the accounting remedy in three circumstances: (1) in cases of especially complicated accounts or mutual accounts; (2) where a fiduciary relationship existed between the parties; and (3) where

discovery was required. *Id.* at 1311. Due to the broadness of modern discovery, a need for discovery alone is insufficient. *Id*. While, theoretically, equitable remedies are only appropriate in the absence of an adequate remedy at law, the Eleventh Circuit, looking to state precedent, found that a fiduciary relationship is sufficient in itself to merit an accounting regardless of adequate remedies at law. *See Id*. at n. 22; *Cassedy v. Alland Invs. Corp.*, 982 So. 2d 719, 720 (Fla. Dist. Ct. App. 2008) ("As fiduciaries, Appellees were required to render a final accounting."); *Ashemimry v. Ba Nafa*, 778 So. 2d 495, 498 (Fla. Dist. Ct. App. 2001) ("Where a fiduciary or trust relationship exists, an action for an accounting is considered equitable in nature without regard to other considerations.").

## III.  Analysis

### a.  *The Retaliation Claims*

The Court first considers Counts I and III, Plaintiffs' retaliation claims pursuant to § 1983.[4] Plaintiffs claim that they made "certain disclosures" to local government agencies and officials, such as the Chainman, Board of Trustees, Assistant City Attorney assigned to the trust regarding suspected violations of federal, state, or local laws or rules, improper use of public office, gross waste of funds, and abuse or gross neglect of duties. D.E. 1 at

---

[4] The Complaint levels five Counts and does not specify which Count is being brought against which defendant. D.E. 1 at 13-23. This would give the appearance that the Complaint is an impermissible shotgun complaint. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313 (11th Cir. 2015) ("Fourth, and finally, there is the relatively rare sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against."). However, a complaint that "can be fairly read to aver that all defendants are responsible for the alleged conduct" does not commit this sin. *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000). The Court finds that the Complaint can be fairly read to aver that Counts I-IV are brought against all Defendants, and that Count V is brought against Bayfront.

14, 18. Plaintiffs claim these disclosures were protected First Amendment speech, and that Defendants retaliated against them by constructively discharging them. D.E. 1 at 14-15, 17-18.

Defendants move to dismiss Counts I and III on the grounds that Plaintiffs' speech was made within the scope of their employment, and thus not protected by the First Amendment. D.E 13 at 8-13; D.E. 14 at 4-6. Further, Defendants argue the Complaint is impermissibly vague in its reference to "certain disclosures" being made by Plaintiffs. D.E. 13 at 8-9; D.E. 14 at 4. Next, Defendants argue that Plaintiffs have failed to show they suffered adverse employment actions and a causal link between protected First Amendment speech and the adverse action. D.E. 13 at 14-15; D.E. 14 at 6-11.

To determine whether Plaintiffs, as public employees, engaged in protected speech, the Court considers whether their speech was made as a private citizen speaking on a matter of public concern, and, if it was, whether their First Amendment right to express themselves "outweighs the interest of the government, as an employer, in the efficiency of public services." *Belyeu v. Coosa Cnty. Bd. of Educ.*, 998 F.2d 925, 928 (11th Cir. 1993). In applying this balancing test, the Court considers three factors: (1) whether Plaintiff's speech impedes the government's ability to perform its duties efficiently; (2) the manner, time, and place of the speech; and (3) the context in which the speech was made. *Id*.

The Court notes that while the standard of pleading required to overcome a motion to dismiss is not high, allegations must rise above the level of "vague and conclusory." *Fullman*, 739 F.2d at 556–57. Merely stating that Plaintiffs made "certain disclosures" cannot, on its own, sustain the Complaint. The Complaint is replete with allegations of

11

corruption perpetrated by Carollo and Banos in their official capacity within Bayfront and alleges that Carollo and Banos opposed efforts to increase transparency and combat abuse of public funds. D.E. 1 at 3-18.

However, the only protected speech the Court can discern from the Complaint follows Suarez's discovery of illicit drugs inside the Van.[5] D.E. 1 at 9. Following this discovery, Suarez alerted Bayfront's attorney, spoke with the City attorney, and informed MPD. *Id*. Suarez then participated in an IA investigation into the illegal drugs. *Id*.

When Carollo learned of this, he told Suarez he had "hoped [Suarez] learned [his] lesson in trying to be transparent" and warned Suarez to "lawyer up." *Id*. The Complaint alleges that after attempting to foster transparency and ethics in Bayfront, Suarez was constructively discharged from Bayfront. *Id*. at 10. Carollo isolated Suarez and undermined his ability to perform his duties. *Id*. at 11. Carollo transferred, replaced, and attacked employees who worked with Suarez.[6] *Id*. Carollo directed employees under Suarez not to cooperate with Suarez and to keep Suarez out of the loop. *Id*. Carollo then sought to replace Suarez, by interviewing candidates for the position of interim director and offered the position to one of Suarez's employees.[7] Carollo defamed Canto, implying that Canto,

---

[5] The Van itself is of suspicious provenance, according to the Complaint. Plaintiffs claim the Van was purchased well over market value from an entity formed shortly before Bayfront purchased the Van and dissolved shortly thereafter. D.E. 1 at 8-9. The Complaint, however, does not explicitly claim that Suarez or Canto exercised their speech to shed light on this wrongdoing. *See Id*.

[6] Not including Canto, the Complaint gives two such examples. First, an executive administrator who, after meeting with Carollo, came into Suarez's office, crying, and said she was resigning. D.E. 1 at 11. Second, Albert Mora, who Suarez had hired to clean the Park, was reassigned by Carollo or at Carollo's direction. *Id*.

[7] The complaint claims Carollo instructed Santravia Butler to undermine Suarez, and that afterwards Carollo offered the position of interim director to Butler. D.E. 1 at 11.

whom Suarez had hired to increase transparency and combat corruption in Bayfront, had stolen money from Bayfront and had failed to fulfill his work hours. *Id*. The Complaint claims that this caused Canto stress and anxiety, leading Canto to resign. *Id.* at 12. Suarez claims he was ousted from Bayfront on December 17, 2024. *Id*. On December 20, 2024, Carollo held an emergency meeting in which he defamed Suarez, accusing him of, *inter alia*, failing to report for work, falsifying timesheets, granting unauthorized raises to staff, working remotely and taking vacation days without authorization, committing contract errors, and colluding with an assistant City attorney to alter the terms of his employment contract. *Id.* at 12. Suarez further claims that after his departure from Bayfront, he was denied compensation, including three months' salary and compensation for unused vacation time.[8] *Id*. at 16.

The Court here first considers whether Suarez's speech, in reporting the illicit drugs, discussing the matter with Bayfront's attorney and the City's attorney, and participating in the IA investigation, was protected speech. *Pickering* sets forth a two-part balancing test to determine whether speech made by a public employee is protected by the First Amendment. *Pickering*, 391 U.S. at 568. First, the speech must be made as a private citizen

---

[8] The Bayfront Motion argues that the denial of pay cannot form part of the basis of Suarez's claim of constructive discharge as the Complaint does not allege this harm occurred until after Suarez left Bayfront. D.E. 14 at 16 n.4. While this is legally sound reasoning, it mischaracterizes the substance of the Complaint. Suarez claims that he was constructively discharged from Bayfront, *and* that he has since been denied compensation. D.E. 1 at 16. The denial of his salary and compensation for unused vacation days, like Carollo's defamation of Suarez post-departure, can form part of Suarez's claim for retaliation. Further, Suarez claims that he was denied approximately three months of salary. *Id*. If Suarez were to claim this denial of compensation began before his departure from Bayfront and that it contributed to the reasons for his discharge, then the Court sees no reason why it could not form part of the basis for constructive discharge.

on a matter of public concern. *Id*. Whether speech by a public employee is made as a private citizen is chiefly determined by whether the speech was made within the scope of their job duties. *Garcetti*, 547 U.S. at 411, 421. Speech that "owes its existence to a public employee's professional responsibilities" may fairly be restricted by public employers. *Id*. However, this proposition "must be read narrowly to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment." *Alves v. Bd. of Regents of the Univ. Sys. of Georgia*, 804 F.3d 1149, 1162 (11th Cir. 2015).

In *Lane*, the Supreme Court held that sworn testimony given by a public official was "a quintessential example of speech as citizen[.]" *Lane v. Franks*, 573 U.S. 228, 238 (2014). That the plaintiff in Lane discovered the information through the course of his duties did not alter the conclusion. *Id*. at 240. In *Carollo*, then-plaintiff-now-defendant Carollo, as city manager, made reports to investigative agencies relating to violations of campaign finance laws, violations of financial disclosure laws, and corruption. *Carollo v. Boria*, 833 F.3d 1322, 1326 (11th Cir. 2016). The Eleventh Circuit held that despite his position as a "supervising public official," he "plausibly alleged that he spoke as a citizen about violations of Florida's campaign finance laws." *Id*. at 1330.

In the present case, despite the fact that Suarez, a high-ranking official within Bayfront, discovered illegal drugs being stored within Bayfront's property in the course of his work, it appears he did not speak out on the matter in pursuit of his duties. Defendants, while claiming Suarez had broad duties and spoke as a public employee, have not advanced

any argument that reporting illegal drugs or participating in IA investigations constitute functions of Suarez's job as executive director of Bayfront. D.E. 13 at 9-13; D.E. 14 at 5-6. Instead, Suarez appears to have spoken out as a citizen concerned about illegal drugs. He promptly notified Bayfront's attorney, the City's attorney, and participated in the IA investigation relating to the drugs. D.E. 1 at 9.

This leads to the second half of the first *Pickering* factor: that the speech concerned a matter of public concern. "To fall within the realm of 'public concern,' an employee's speech must relate to 'any matter of political, social, or other concern to the community.'" *Alves*, 804 F.3d at 1163. Clearly, illegal drugs being stored within public property are a matter of public concern. In addition to the obvious concern that illegal drugs are of social concern, the fact that Bayfront, a trust established by the City, was in possession of those drugs raises the specter of corruption. *See Bryson v. City of Waycross*, 888 F.2d 1562, 1566 (11th Cir. 1989) ("[A] core concern of the first amendment is the protection of the 'whistle-blower' attempting to expose government corruption."). Because Suarez's objective was apparently to bring wrongdoing to light, the Court finds that Suarez has plausibly alleged that he spoke out as a private citizen on a matter of public concern. *See Alves*, 804 F.3d at 1167 ("[W]as it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?").

As Suarez has plausibly shown that he was speaking as a private citizen on a matter of public concern, the Court proceeds with the *Pickering* analysis. In balancing the First Amendment rights of public employees against the interest of the public employer in the

efficiency of public services, courts consider three factors: (1) whether the speech at issue impedes the government's ability to perform its duties efficiently; (2) the manner, time, and place of the speech; and (3) the context within which the speech was made. *Belyeu*, 998 F.2d at 928. Suarez did not publish or promote his speech and instead reported an apparent crime to relevant authorities and participated in an IA investigation. D.E. 1 at 9. Each of the three factors weighs in Suarez's favor. His speech did not disrupt Bayfront's operation, was made within a closed circuit of attorneys and investigators, and was made within an appropriate context. Suarez, though a public employee, spoke as a private citizen on a matter of public concern, and his speech relating to the drugs in the Van was protected by the First Amendment.

Next, the Court looks to whether Suarez suffered any adverse action in the aftermath of his speech. Where "an employer's conduct negatively affects an employee's salary, title, position, or job duties, that conduct constitutes an adverse employment action." *Akins*, 420 F.3d at 1300. Constructive discharge "negatively affects an employee's job status, and therefore constitutes an adverse employment action." *Id.* at 1300-1301. However, constructive discharge requires "working conditions are so intolerable that a reasonable person would have felt compelled to resign[.]" *Id*. at 1301.

Suarez claims that he suffered adverse action at the hands of Defendants and that these adverse actions were severe enough to force him out of Bayfront, constituting constructive discharge. D.E. 1 at 12. Carollo reprimanded Suarez for seeking to foster transparency, warned him to "lawyer up," and then proceeded to harass employees working with Suarez. *Id*. at 10-12.  This apparently worked, as two employees, one of whom was

16

Canto, resigned, and another was transferred, apparently at Carollo's direction. *Id*. at 11-12. Carollo also sought to replace Suarez, before Suarez had considered leaving his position. *Id*. at 11. Here, the Court need not find whether these actions constituted constructive discharge. The Complaint sets forth a plausible claim that Suarez was constructively discharged, and thus that conditions of Suarez's employment were negatively impacted by Carollo.[9] Noticeably absent from the Complaint, however, is an allegation that after Suarez participated in the IA investigation, Suarez suffered an adverse employment action at the hands of Banos. *See* D.E. 1 at 8-15. Accordingly, Count I fails to state a claim against Banos.[10]

Finally, the Court considers whether the Complaint plausibly alleges that the adverse employment action was causally linked to the expression of speech. "A plaintiff's burden regarding causation 'is not a heavy one." *Acevedo v. City of Miami*, No. 22-20224-CV, 2024 WL 3856246 (S.D. Fla. July 29, 2024). The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). The Eleventh Circuit in *Akins* held that a reasonable jury could conclude that ten months was close temporal proximity. *Akins*, 420 F.3d at 1305. Given that Suarez's employment at Bayfront began in April 2024 and ended in December the same year, and

---

[9] Additionally, Carollo's defamation of Suarez and denying Suarez three months pay after his departure could constitute retaliation.

[10] The Court address Bayfront's municipal liability argument below. *See infra* at 21.

17

given that the adverse action began only after Carollo had learned Suarez participated in the IA investigation, this light burden is met. D.E. 1 at 11.

Suarez has plausibly alleged a §1983 claim for retaliation for his protected speech relating to the drugs stored within the Van. By contrast, the only speech that Canto specifically claims he made was questioning the $20,000 yacht charter fee, "as it was not proper for [Bayfront] to pay for a personal party for Carollo[.]" D.E. 1 at 10. As with auditing Bayfront's finances, questioning questionable expenditures would likely fall within the scope of the official duties of Bayfront's director of finance. The Complaint does not otherwise specify how, when, or where Canto expressed protected speech.

For Count III to proceed, Canto must show, at a minimum, that he exercised his speech as a private citizen on matters of public concern, that his interest in expressing this speech outweighs the government's interest in efficiency of public services, and that he suffered adverse effects that were caused by his exercise of speech. Canto alleges in the Complaint that he was retaliated against by Defendants for exercising his First Amendment rights, including through defamation and constructive discharge. D.E. 1 at 17-18. However, taking as true all the allegations in the Complaint, the Court can still only guess what certain disclosures he made, whether he was speaking as a public employee or a private citizen, how and to whom these disclosures were made, and whether he was retaliated against for making disclosures.

Because the Complaint does not offer sufficient factual support to allege Defendants retaliated against Canto for exercising his First Amendment rights in violation of § 1983, Count III is dismissed as to all Defendants.

### 1. *Carollo's Qualified Immunity Argument*

The Carollo Motion argues that even if the Complaint set forth a §1983 Retaliation claim, Carollo and Banos are entitled to qualified immunity as they were acting within their discretionary authority when they took actions against Plaintiffs, and they did not violate Plaintiffs' clearly established rights. D.E. 14 at 11-14. In their Response, Plaintiffs argue that Carollo and Banos were not acting within the scope of their discretionary authority, and that their clearly established rights were violated. D.E. 30 at 15-18.

As the Complaint fails to establish that Canto was retaliated against, and fails to establish that Banos retaliated against Suarez, the Court only considers whether Carollo has established that he is entitled to qualified immunity with respect to Count I. "To benefit from qualified immunity, a government official must make a threshold showing that his actions were undertaken pursuant to performance of his duties within the scope of his authority." *Akins v. Fulton Cnty., Ga.*, 420 F.3d 1293, 1299–300 (11th Cir. 2005). Once a defendant public official meets this burden, it falls to the plaintiff to show that the defendant violated their constitutional right, and that the right was clearly established at the time of the violation. *Brooks v. Warden*, 800 F.3d 1295, 1306 (11th Cir. 2015).

That Carollo was acting within his discretionary authority seems apparent, at least from the Complaint. Carollo sought to use his position within Bayfront to undermine and isolate Suarez by transferring employees who worked with him, directing other employees who worked with him to undermine him, attacking employees hired by Suarez during Bayfront meetings, and seeking a replacement for Suarez. D.E. 1 at 10-12. These actions

seem to indicate that Carollo was acting within his discretionary authority as chairman of Bayfront when he allegedly retaliated against Suarez.

The first prong being established by Carollo, the Court considers whether Suarez can show that Carollo violated Suarez's clearly established right. The Response argues it can. D.E. 30 at 17. The Court agrees that clearly established law protects a public employee's right to exercise their right to speak as a private citizen on matters of public concern. *See Pickering*, 391 U.S. at 574; *Lane*, 573 U.S. at 238; *Akins*, 420 F.3d at 1303-1304. Fundamentally, the requirement that a constitutional right be "clearly established" at the time of the violation is "to give 'fair warning' to the official that his conduct is unlawful." *Akins*, 420 F.3d at 1305. The Court finds the following binding, precedential language particularly enlightening:

> Against the backdrop of this Circuit's precedents and the Supreme Court's guidance in *Pickering* and *Garcetti*, we conclude that reasonable public officials would have known at the time of Carollo's termination that it violated the First Amendment to terminate a colleague for speaking about matters of public concern that are outside the scope of his ordinary job responsibilities.

*Carollo v. Boria,* 833 F.3d 1322, 1334 (11th Cir. 2016), *abrogated on other grounds by Gilmore v. Georgia Dep't of Corr.,* 111 F.4th 1118 (11th Cir. 2024). Carollo's claim of entitlement to qualified immunity is denied.

20

2. *Bayfront's Municipal Liability Argument*

The Bayfront Motion additionally argues that the Complaint fails to set forth an argument for municipal liability pursuant to *Monell*. D.E. 13 at 5-6. "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

The Complaint appears to be travelling under a theory of *respondeat superior*. Bayfront, as a limited agency and instrumentality of the City, is not subject to *respondeat superior* liability. *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Nowhere in the Complaint does Suarez actually allege that Bayfront held a custom or policy that showed deliberate indifference to Suarez's constitutional rights, let alone allege causation. *See* D.E. 1. The Response argues that the Complaint "describes a rampant culture of concealing corruption and misuse of public assets, [and] it is only reasonable to infer that [Bayfront] is presumptively liable for fostering that culture through a policy or custom[.]" D.E. 30 at 13.

It is not for the Court to guess and grasp at Suarez's meaning. If either of the Plaintiffs wishes to level a claim against Bayfront, they will have to do so in the complaint by setting forth facts that plausibly allege Bayfront is liable under a *Monell* theory. Count I is dismissed as to Bayfront.

### b. *The Florida Whistleblower Act Claims*

The Motions allege that Counts II and IV of the Complaint fail to allege a claim for violation of § 112.3187 as both Plaintiffs fail to meet the requirements of subsections (4)-(7), and both Plaintiffs failed to exhaust administrative remedies prior to filing suit. D.E. 13 at 14-19; D.E. 14 at 14-18.

FWA claims are analyzed in the same manner as Title VII claims. *See Sierminski*, 216 F.3d at 950-951. Plaintiffs must set forth facts alleging they engaged in a protected activity, suffered an adverse employment action, and that there is a causal link between the two. *Fla. Dep't of Child. & Fams. v. Shapiro*, 68 So. 3d 298, 305-306 (Fla. Dist. Ct. App. 2011). The "protected activity" prong requires the Plaintiffs to have made protected disclosures in proper form to the appropriate authorities. Fla. Stat. Ann. § 112.3187 (West). Barring a showing of futility, Plaintiffs were required to have exhausted their administrative remedies prior to filing suit. *Igwe v. City of Miami*, 300 So. 3d at 282.

Plaintiffs' vague assertions of making "certain disclosures" to "local government agencies" are insufficient to sustain their claim even to the plausibility standard. D.E. 1 at 15, 19. Suarez and Canto may well be whistleblowers. But to succeed in their claim for whistleblowing, they first must allege they blew the whistle. Merely learning of corruption and opting to remain silent does not create a cause of action. Canto wholly fails to allege he engaged in protected speech, and he likewise fails to allege he made any protected disclosures to any appropriate authorities. *See Id.* at 17-21.

As noted above, despite the numerous allegations contained within the Complaint, the only protected speech alleged by either of the Plaintiffs alleges was Suarez's report to the authorities regarding illicit substances found in the Van, and his subsequent participation in the IA investigation. *See supra* at 12. On its face, this would seem to satisfy subsections (4)-(7) of the FWA. Fla. Stat. Ann. § 112.3187(4)-(7) (West). Suarez made a disclosure of a relevant nature in an appropriate manner to the appropriate authorities by participating in the IA investigation.

The Court turns to Suarez's argument of futility in lieu of exhausting administrative remedies. Suarez claims that filing a grievance or requesting a hearing would have been futile because: (1) the civil service review board presents its findings to the city manager, Arthur Noriega ("Noriega"); (2) Noriega is complicit in Carollo's corruption by accepting funds misappropriated from Bayfront in connection to a political event; (3) Noriega is a close confident to Carollo; (4) Noriega, as city manager, makes recommendations on civil service board complaints to City commissioners; and (5) Carollo, the party about whom Suarez would complain, is a city commissioner who would hear the recommendations. D.E. 1 at 17.

Here, as with the plaintiff in *Acevedo*, Suarez would have to make a complaint through one of Carollo's alleged allies, and the complaint would ultimately be heard by Carollo himself. *Acevedo*, 2024 WL 3856246 at *4. The court in *Acevedo* found that the plaintiff had "made a clear showing of futility." *Id*. In the present case, Carollo, not Noriega or the City, is named as a defendant. Nevertheless, a civil service complaint filed by Suarez would ultimately be heard by, among others, Carollo, who Suarez accuses of corruption

23

and retaliation. The Court finds that Suarez has plausibly alleged futility, and thus excuses at this stage his non-exhaustion of administrative remedies. Should Defendants wish to raise this argument on a motion for summary judgment, the Court will consider it then.

The Court has already found that Suarez has plausibly alleged that he suffered adverse employment action and that the adverse action was causally linked to the protected speech. *See supra* at 16-18. For the sake of brevity, and because the analysis is substantially the same here, the Court adopts its analysis and finds that Suarez has plausibly alleged that he suffered an adverse employment action and has plausibly alleged causation. Here, as with Count I, Suarez only alleges these prongs with respect to Carollo. He does not allege Banos retaliated against him and he does not allege a *Monell* claim against Bayfront. Accordingly, the Complaint only plausibly alleges a claim under § 112.3187 against Carollo.

### c. *Canto's Claim for Accounting*

The Bayfront Motion argues that Canto lacks standing to challenge trust expenditures, as taxpayers and citizens lack standing to challenge a governmental action unless they have suffered a special injury, and that Canto has failed to allege special injury. D.E. 13 at 21; *see Solares v. City of Miami*, 166 So. 3d 887, 888 (Fla. Dist. Ct. App. 2015). The Carollo Motion argues that Canto has failed to allege either a fiduciary relationship or an inadequate remedy at law.[11] D.E. 14 at 18.

---

[11] The Carollo Motion misinterprets *Zaki Kulaibee* by arguing that Canto must show both a fiduciary relationship and an inadequate remedy at law. As explained above, *Zaki Kulaibee* stands for the proposition that where a party can show a fiduciary duty, they need not also show an inadequate remedy at law. *See supra* at 9-10; *Zaki Kulaibee*, 771 F.3d at 1311.

In the Complaint, Canto claims that he is a resident and taxpayer and "has standing based on the unconstitutionality of certain appropriations by [Bayfront] as violative of constitutional provisions." D.E. 1 at 23. However, in the Response, Canto contends that he has standing as he has suffered special injury due to Carollo's public attacks against Canto, in which he accused Canto of stealing from Bayfront. D.E. 30 at 26. Thus, the Complaint and the Response seem to offer two different explanations for why Canto has standing and what harm accounting would remedy. This sort of moving target is unfair to both Defendants and to the Court.

Further, Defendants are correct in stating that Canto does not allege he has standing to challenge Bayfront's actions. Although he is a taxpayer and resident, he does not allege special injury and thus does not have standing to sue for an accounting. *Solares*, 166 So. 3d at 888 ("[T]he Florida Supreme Court has repeatedly held that citizens and taxpayers lack standing to challenge a governmental action unless they demonstrate either a special injury, different from the injuries to other citizens and taxpayers[.]"). As Article II, Section 8 of the Florida Constitution is not self-executing, it cannot form the basis of a claim. *St. John Med. Plans, Inc. v. Gutman*, 696 So. 2d 1294, 1295 (Fla. Dist. Ct. App. 1997), *approved,* 721 So. 2d 717 (Fla. 1998) ("Article II, section 8 of the Florida Constitution, known as the 'Sunshine Amendment,' serves as the philosophical basis upon which a public official conducts the affairs of his or her office.").

Theoretically, Canto may be able to advance a count requesting accounting. He claims, at least in his Response, that he suffered a special injury that would confer on him standing. *Id*. He was the director of finance for Bayfront, and his job duties could

25

potentially establish a fiduciary relationship between himself and Bayfront. However, because the Complaint puts forth neither a basis for his standing nor a basis for accounting, and because Canto cannot rely on his Response to correct his Complaint, Count V is dismissed.

### d.  Dismissal With Prejudice Is Unwarranted

Even though the Complaint contains deficiencies meriting its dismissal, dismissal with prejudice would be inappropriate. This Court does not typically dismiss an original complaint with prejudice, disallowing a plaintiff even one opportunity to amend. Such a drastic measure would foreclose potentially meritorious claims on what may be procedural or pleading defects in the complaint. For instance, Plaintiffs both claim that they made certain disclosures to various authorities regarding legal violations, misuse and waste of funds, and abuse or gross neglect of duties by Defendants. D.E. 1 at 14, 18. If these claims are true, then the Complaint may only be poorly pleaded and not substantively defective. Plaintiffs shall have an opportunity to fix the deficiencies in the Complaint.

This aversion to dismissing an original complaint is especially relevant in the present case, where the Complaint involves allegations of corruption, including embezzlement and cronyism, by City officials operating a City-run trust. Whether these allegations are true or untrue remains to be seen. But discovery exists to further such revelations. Should Plaintiffs decide to file an amended complaint, and anticipating good faith from the parties, the Court intends to hear this matter on its merits.

The Complaint is only partially defective. However, for the sake of consistency and clarity, the Court will dismiss the Complaint in its entirety without prejudice and allow Plaintiffs the opportunity to file an amended complaint that includes all Counts they intend to bring. Any future complaint shall be consistent with the findings in this Order, with the law, and with applicable precedent. Further, the amended complaint shall clearly delineate which counts are brought against which Defendants. Should Carollo and Banos wish to set forth a qualified immunity argument in a future motion to dismiss or a motion for summary judgment, the Court will revisit the issue at that point.

## IV.    Conclusion

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that the Bayfront Motion (D.E. 13) and the Carollo Motion (D.E. 14) are **GRANTED**. The Complaint is **DISMISSED WITHOUT PREJUDICE**. Plaintiffs shall have 14 days from the entry of this Order to file an amended complaint. Failure to do so may result in dismissal with prejudice without further notice from the Court.

**DONE AND ORDERED** in Chambers at Miami, Florida this 23rd day of March 2026.

JOAN A. LENARD
**UNITED STATES DISTRICT JUDGE**